J-A08006-23

2023 PA Super 249

| | | |
|---|---|---|
| TRIZECHAHN GATEWAY LLC, A DELAWARE LIMITED LIABILITY COMPANY | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : | |
| v. | : : | |
| | : : | No. 1043 WDA 2022 |
| SCHNADER HARRISON SEGAL & LEWIS, LLP, PAUL H. TITUS, AND THOMAS D. ARBOGAST | : : : : | |
| Appellees | | |

Appeal from the Judgment Entered September 12, 2022
In the Court of Common Pleas of Allegheny County
Civil Division at No: GD-07-008527

BEFORE: STABILE, J., SULLIVAN, J., and PELLEGRINI, J.[*]

OPINION BY STABILE, J.: **FILED: NOVEMBER 30, 2023**

Appellant, TrizecHahn Gateway, appeals from the September 12, 2022 judgment entered in favor of Appellees, Schnader Harrison Segal & Lewis, LLP ("Schnader"), Paul H. Titus ("Titus"), and Thomas D. Arbogast ("Arbogast") (together with Titus, the "Debtors"), under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa.C.S.A. § 5101, et. seq.[1] We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] After the commencement of this litigation, the legislation was renamed the Pennsylvania Uniform Voidable Transactions Act. 12 Pa.C.S.A. § 5101(a), as amended. 2017 Pa. Laws 1249, No. 78, § 2. The parties agree that PUFTA applies to this action. Throughout this opinion, we will cite to and quote PUFTA rather than the present version of the statute.

The Debtors were partners of the Pittsburgh law firm Titus & McConomy LLP when that firm entered a commercial lease agreement with Appellant. In July of 2000, Appellant filed suit in Allegheny County (the "Underlying Lawsuit") against Titus & McConomy LLP and its partners, including the Debtors, for breach of the lease agreement. On May 31, 2006, the trial court entered a judgment (the "Judgment") in the Underlying Lawsuit in favor of Appellant and against the Debtors and other remaining defendants of more than $3 million.

By this time, Titus and McConomy LLP had dissolved and the Debtors had become partners of Schnader. The complaint in the instant matter, filed on April 24, 2007, alleged that the Debtors transferred their rights (the "Transfers") to the money in their Schnader capital accounts (the "Accounts") to Schnader in exchange for Schnader's representation of them in the appeal from the Judgment in the Underlying Litigation. Schnader filed financing statements referencing the Transfers on April 25, 2005, shortly after the trial court entered its verdict in the Underlying Litigation. Schnader claims to be a secured creditor with a priority interest in the Accounts, a claim that has prevented Appellant from accessing those funds in execution of the Judgment. For these reasons, Appellant argues the Transfers were actionable under PUFTA.

After a trial on May 2, 2018, the trial court found in favor of Appellees. By memorandum of November 8, 2019, this Court vacated and remanded,

directing the trial court to provide a more thorough analysis of Appellant's claims. In response, the trial court filed an opinion dated October 5, 2020 and a supplemental opinion dated December 16, 2020. On review, this Court once again vacated and remanded, instructing the trial court to prepare an opinion compliant with the previous remand order. On August 25, 2022, the trial court issued an opinion in response to our second remand order authored by Judge Michael A. Della Vecchia, as Judge Judith L. A. Friedman, the author of the first two opinions, had retired from the bench. This matter is now ripe for our review.

Appellant argues that the Transfers were actionable under PUFTA, and that the trial court erred in finding otherwise. Appellant presents five questions:

1. Whether the trial court erred by making mistakes of law and fact when considering the factors set forth in 12 Pa.C.S.A. § 5104(b)(8) and (9) in determining that [Appellant] has failed to show that [the Debtors] provided reasonably equivalent value in exchange for the [T]ransfers and that they were insolvent shortly after the [T]ransfers were made.

2. Whether the trial court erred by simply comparing the number of factors of 12 Pa.C.S.A. § 5104(b) present versus not present when determining that enough badges of fraud were not present for purposes of 12 Pa.C.S.A. § 5104(a)(1).

3. Whether the trial court made mistakes of law and fact in determining that [the Debtors] did not make [the T]ransfers 'with actual intent to hinder, delay or defraud any creditor of the debtor.' See 12 Pa.C.S.A. § 5104(a)(1).

4. Whether, contrary to the Superior Court's instructions, the trial court failed to determine whether reasonably equivalent value

- 3 -

was provided in exchange for the [T]ransfers from the point of view of [Appellant].

5. Whether, contrary to the Superior Court's instructions, the trial court erred by failing to address the claims set forth in [Appellant's] complaint pursuant to § 5104(a)(2) and § 5105, including, but not limited to, whether reasonably equivalent value was received in exchange for the [T]ransfers based upon, among other things, the fact that the [T]ransfers were made in exchange for an unperformed promise that the trial court mistakenly stated were made in exchange for legal services already provided.

Appellant's Brief, at 3-5 (underscoring in original).

Avoidance of a transfer under PUFTA is an equitable remedy. Our standard of review is as follows:

In prior matters involving review of alleged fraudulent conveyances, we have stated that our standard of review of a decree in equity is particularly limited and that such a decree will not be disturbed unless it is unsupported by the evidence or demonstrably capricious. The findings of the chancellor will not be reversed unless it appears the chancellor clearly abused the court's discretion or committed an error of law. The test is not whether we would have reached the same result on the evidence presented, but whether the chancellor's conclusion can reasonably be drawn from the evidence.

***Mid Penn Bank v. Farhat***, 74 A.3d 149, 153 (Pa. Super. 2013).

PUFTA permits avoidance of transfers under the following circumstances:

**(a) General rule.--**A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

- 4 -

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

[…]

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa.C.S.A. § 5104(a). Appellant alleged causes of action against Appellees under § 5104(a)(1) and (2)(ii), as well as under § 5105:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa.C.S.A. § 5105.

In its first assertion of error, Appellant claims the trial court erred in assessing whether the Debtors received reasonably equivalent value in exchange for the transfers, and whether they became insolvent shortly thereafter. Appellant references § 5104(b)(8) and (9), which are among the factors relevant in determining the transferor's intent for purposes of § 5104(a):

**(b) Certain factors**.--In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

[…]

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred[.]

12 Pa.C.S.A. § 5104(a)(8), (9).[2]

---

[2] For reference, § 5104(b) reads in its entirety as follows:

> b) **Certain factors**.--In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:
>
> > (1) the transfer or obligation was to an insider;
> >
> > (2) the debtor retained possession or control of the property transferred after the transfer;
> >
> > (3) the transfer or obligation was disclosed or concealed;
> >
> > (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> >
> > (5) the transfer was of substantially all the debtor's assets;
> >
> > (6) the debtor absconded;
> >
> > (7) the debtor removed or concealed assets;
> >
> > (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> >
> > (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> >
> > (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> >
> > (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa.C.S.A.§ 5104(b).

Appellant cites *Farhat*, in which the appellee debtor transferred a real estate parcel to his parents for one dollar (his parents had transferred the property to him for one dollar several years earlier) after the appellant bank threatened to execute judgment against him pursuant to a loan agreement. *Farhat*, 74 A.3d at 151. The parents subsequently sold the property for $275,000.00. The trial court found in favor of the debtor and his parents, reasoning that the conveyance was done without actual intent to defraud the bank. *Id.* at 154. This Court reversed. While accepting the trial court's findings that the conveyance took place between insiders (parents and son), after a lawsuit was threatened, and shortly before the son incurred a substantial debt (§ 5104(b)(1), (4), and (10), respectively), the *Farhat* court found error in other respects. In particular, the *Farhat* Court concluded that the trial court erred in finding that the debtor lacked a sufficient financial stake in or control of the property. *Id.* at 155. Further, the transfer for one dollar of a property that sold for $275,000.00 shortly thereafter clearly was not a transfer for reasonably equivalent value under 5104(b)(8). *Id.* Finally, we disagreed with the trial court's finding that the debtor was solvent because he was making timely payment of his bills. *Id.* at 156. The record reflected that the debtor's assets were worth less that the debt he owed to the bank. *Id.* Therefore, the *Farhat* Court concluded that the debtor was insolvent under §§ 5102(a) and 5104(b)(9). *Id.* at 156.

Appellant also relies on *Fell v. 340 Assocs., LLC*, 125 A.3d 75 (Pa. Super. 2015), *appeal denied*, 140 A.3d 13 (Pa. 2016), wherein the creditor, winner of a $6.8 million judgment against the debtor and others in a dram shop action, sought to set aside the debtor's transfer of its liquor license. The debtor offered the license for sale in January of 2006, the creditor was injured in March of 2007 and filed suit against the debtor and others in November of 2007. In June of 2009, the debtor finally sold the license for $75,000.00, well below the original $375,000.00 asking price. *Id.* at 77-80. The purchaser was to make payments pursuant to a loan agreement and judgment note, and the purchaser was required to sell the license to a company controlled by the debtor at the expiration of the purchaser's lease of the debtor's restaurant premises. *Id.*

The trial court, reasoning that the license was for sale well before the creditor's injury and the ensuing dram shop litigation, declined to set the transfer aside, despite the presence of several indicators of fraud under § 5104(b).[3] This Court reversed because the debtor failed to procure sufficient value for the license. In effect, the debtor loaned the purchaser the money for the purchase price of the license. *Id.* at 84. The debtor therefore

---

[3] The trial court found that the transfer occurred after the debtor had been sued, that it was substantially all of the debtor's assets, that the debtor was insolvent as of the time of transfer, and that the transfer occurred after the debtor incurred a substantial debt. *See*, 12 Pa.C.S.A. § 5104(b)(4), (5), (9), (10).

transferred its only asset in exchange for nothing of immediate value, thereby leaving itself incapable of paying its outstanding debts. This, in addition to the other § 5104(b) factors the trial court found present, led the **Fell** Court to vacate and remand for entry of judgment in favor of the creditor. **Id.** at 84.

In analyzing § 5104(b)(8) in the instant case, the trial court noted that the amount of the Transfers (a combined total of roughly $118,000 in Titus' and Arbogast's capital accounts) was considerably lower than the value of the services it ultimately received from Schnader ($400,000). Trial Court Opinion, 8/25/22, at 21. Based on those numbers, which Appellant does not dispute, the trial court found that the Debtors received reasonably equivalent value in exchange for the Transfers. In this regard, the present case is easily distinguishable from **Farhat** (where in a property worth $275,000 was transferred for $1) or **Fell** (wherein the debtor lent the purchaser the money to buy the asset at well below asking price).

Appellant argues, however, that an unperformed promise does not constitute value under § 5103:

> (a) General rule.--Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but **value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.**
>
> (b) Reasonably equivalent value.--For the purposes of sections 5104(a)(2) (relating to transfers fraudulent as to present and future creditors) and 5105 (relating to transfers fraudulent as to present creditors), a person gives reasonably equivalent value

if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or the exercise of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust or security agreement or pursuant to a regularly conducted, noncollusive execution sale.

12 Pa.C.S.A. § 5103 (emphasis added).

The trial court rejected Appellant's argument under § 5103, concluding that "[Appellant's] assertion that Schnader's engagement to provide prospective legal services to the Debtors constitutes an 'unperformed promise' is of no moment because at the time, Schnader had already begun to perform legal services for them." Trial Court Opinion, 8/5/22, at 20. Appellant disputes this, noting that the Transfers occurred on April 19, 2005, whereas the Debtors did not receive their first invoices from Appellant until May of 2005. Appellant is wrong about the facts, as the parties' joint stipulation states that Schnader commenced work on behalf of the Debtors on April 1, 2005, several weeks before the Transfers. Joint Statement of Undisputed Facts, 5/2/18, at ¶ 11. Given this stipulation, the record supports the trial court's finding that the Debtors did not receive a mere unperformed promise in exchange for the Transfers.

We must also take account of the remainder of the portion of § 5103(a) bolded above: "[…] an unperformed promise **otherwise** than in the ordinary course of the promisor's business to furnish support to the debtor or another person." In other words, the text of § 5103(a) permits the debtor to give consideration in exchange for a promise—made **within** the ordinary course of

the promisor's business—to provide support to the debtor.[4]  Schnader, the promisor, made a promise in the ordinary course of its business—the practice of law—to represent the Debtors in their appeal from the Underlying Judgment.  The Transfers served as a retainer fee for Schnader's services.[5]

Our reading of the text of § 5103(a) is consistent with its attendant Bar Association Comment.[6]  Of particular import is Comment (2), which states that "Consideration having no utility from the creditor's viewpoint does not satisfy the statutory definition [of value]."  12 Pa.C.S.A. § 5103, cmt. 2.  In one of our prior remand memoranda we directed the trial court to analyze the Transfers from the creditor's point of view, as per Comment 2.  *TrizecHahn v. Schnader Harrison Segal & Lewis, LLP*, 2019 WL 5858227 at *7 (Pa. Super. filed Feb. 8, 2019).  Appellant argues Schnader's representation of the Debtors was hostile to Appellant and therefore had no utility from Appellant's standpoint.  This argument, based on Comment 2 considered in isolation, would seem to provide Appellant a meritorious argument.  But to read

---

[4]  We interpret § 5103(a) according to its plain meaning.  1 Pa.C.S.A. § 1921(b).

[5]  We note that Rule 1.16 of the Pennsylvania Rules of Professional Conduct limits the circumstances under which Schnader could have withdrawn its representation after the Debtors engaged it to represent them.  Pa.R.P.C. 1.16.

[6]  Again, we note that we are citing to the version of PUFTA extant at the time this lawsuit was filed.  The comment to present version of § 5103 is titled "Uniform Law Comment."

Comment 2 in isolation would not comport with the language of § 5103(a), nor would it comport with the remainder of the comments. As we explained just above, § 5103(a) expressly permits the debtor to procure support services from entities in the business of providing it. The fourth Bar Association Comment provides that such support includes "housing, feeding, clothing, medical care, recreation, education, travel, burial and similar services and expenses provided to an individual." 12 Pa.C.S.A. § 5103, cmt. 4. In other words, § 5103(a) and Comment 4 indicate that a debtor may spend money to procure necessary services. Even though these services come at the expense of the debtor, and are of no **monetary value** to the creditor, the **utility** of these services, even from the standpoint of the creditor, is obvious. Comment 2 directs an analysis of the utility of the consideration from the standpoint of the creditor, not its monetary value to the creditor. We believe that the procurement of legal representation in exchange for a retainer is an example of a transaction that is of obvious utility but no monetary value from the standpoint of the creditor.[7] For the foregoing reasons, we reject Appellant's challenge to the trial court's analysis under § 5104(b)(8).

Regarding § 5104(b)(9), the court reasoned that the Debtors did not become insolvent shortly after the Transfers, as they did not file for

---

[7] Appellant does not argue to this Court that the dollar amount of Transfers was excessive for a retainer.

- 12 -

bankruptcy protection until several years later. Trial Court Opinion, 8/25/22, at 22-23. Appellant counters that the filing of a bankruptcy petition is not determinative under the statute, as a party may become insolvent well before filing for bankruptcy. Appellant relies on *Farhat*, wherein this Court concluded that the debtor was insolvent at the time of the disputed transfer, even though he was still paying bills on time, because there was clear evidence that the debtor's assets were worth less than the outstanding debts. Appellant argues the same is true in this case.

Turning to the facts, Titus and Arbogast each stipulated that their assets were worth less than the amount of the Judgment. But they note that the amount of the non-jury verdict was $2.961 million, and that the $3.274 million Judgment was entered after the Transfers (the Transfers occurred after the verdict but before entry of the Judgment). Thus, according to the Debtors, their stipulations that their assets were worth less than $3.274 million as of the entry of Judgment is not sufficient evidence of their insolvency at the time of or shortly after the Transfers. That is, each of the Debtors could have had assets worth more than $2.961 million but less than $3.274 million at the time of the Transfers.

Given the analysis in *Farhat*, the trial court was incorrect in relying on the timing of the Debtors' bankruptcy petitions. *Farhat* establishes that a finding of insolvency is appropriate if a debtor's assets are less than its liabilities, even if the debtor has yet to file for bankruptcy or otherwise

acknowledge its insolvency. To this extent, we agree with Appellant. On the other hand, the Debtors' argument—that the Debtors' assets[8] near the time of the Transfers could have been more than the amount of the verdict but less than the amount of the Judgment—strains credulity but is not foreclosed by the record. We are not a factfinding court, and in any event, there appears to be no precise evidence of the Debtors' assets at or near the time of the Transfers. Despite the trial court's errant legal analysis, Appellant has not established any basis upon which we can overturn the trial court's conclusion under § 5104(b)(9).[9]

Appellant's second argument is that the trial court erred in simply counting the number of § 5104(b) factors present versus those not present: "The undersigned concludes that because a majority of the eleven factors under § 5104(b) weigh in favor of Schnader, [the Debtors] did not act with actual intent to hinder, delay or defraud [Appellant] by allowing Schnader to place a lien on the Accounts." Trial Court Opinion, 8/25/22, at 24. Appellant

---

[8] The Debtors note that Titus and Arbogast were jointly liable with each other as well as other former partners of Titus and McConomy, but they do not address several liability.

[9] As we explain below, the outcome of this case rested on a judgment call, in light of the applicable law and the remand instructions from our prior panels, as to whether the Debtors were shielding assets in a hopeless case or retaining counsel to appeal from a judgment they believed to be entered in error. In our view, the ultimate outcome is not dictated by any single subsection of § 5104(b). Even were we to conclude that the Debtors were insolvent at the time of the Transfers, our disposition of this appeal would not change.

argues that the foregoing sentence is legal error under *Fell*, wherein this Court explained that the § 5104(b) factors are to be measured "qualitatively, and not quantitatively." *Fell*, 125 A.3d at 82. Appellant's statement of the law is correct. The sentence quoted above is in tension with *Fell*. Indeed, it may be possible in some cases to find a transfer to be in violation of PUFTA even if a majority of the § 5104(b) factors are not present. But it may be possible in other cases for a quantitative and qualitative analysis of § 5104(b) to lead to the same conclusion. Thus, the above-quoted sentence from the trial court's opinion does not, by itself, establish that the trial court reached the wrong conclusion here. Likewise, Appellant's second argument does not, by itself, establish grounds for relief. For reasons we explain throughout this opinion, we discern no reversible error in the trial court's decision.

Appellant next argues that the trial court made errors of law and fact in deciding that the Debtors did not act with fraudulent intent. The trial court found that their intent was to pay for legal representation in their appeal from the Judgment. Trial Court Opinion, 8/25/22, at 25. Appellant criticizes the trial court for demonstrating pity toward and bias in favor of the Debtors based on their involvement in more than two decades of litigation in this matter and the Underlying Lawsuit. Appellant's Brief at 30-31. Appellant argues the Transfers were "distinct attempts, and obviously so, by each of [the Debtors] to place these assets outside of the reach of [Appellant] and its attempts to enforce the [Judgment] it had obtained against each of them." Appellant's

Brief at 33. Appellant notes that Schnader's witnesses and its counsel acknowledged at trial that the reason for the Transfers was to ensure that Schnader would receive compensation for its services:

> Q. For clients that do face substantial judgments and seek legal advice, does Schnader typically require a retainer?
>
> A. Yes.
>
> Q. Why is that?
>
> A. To secure payment for legal services that Schnader provides to the client.

N.T. Trial, 5/2/18, at 78. In this case, Schnader elected to demand a retainer in the form of a security interest in the Accounts rather than cash. *Id.* at 80, 84, 94.

The record reflects that an equity partner's capital account, such as the Accounts that were the subject of the Transfers, operate as follows:

> Q. What is a capital account?
>
> A. Capital accounts are individual contributions made by each of the equity partners in the firm that essentially forms the good will or capital underpinnings for the firm.
>
> Q. Is there actually money sitting in an account somewhere for each equity partner?
>
> A. No. It's really an accounting entry as much as anything else.

*Id.* at 76. The funds accountable to each partner are redistributed to that partner beginning at retirement, resignation, or death, less any money the partner owes to the firm in accordance with the partnership agreement. *Id.* at 77, 85. The amount of money in the Debtor's Accounts was frozen in 2006

when they resigned as equity partners of Schnader. *Id.* at 82. Schnader never pursued the Debtors for any outstanding balance over the amount in the Accounts because the Debtors filed for bankruptcy. *Id.* at 83. Appellant argues, based on the foregoing, that the "facts of this case weigh heavily in favor of a finding that [the Debtors] made [the Transfers] with the intent to hinder, delay or defraud [Appellant] as the judgment creditor." Appellant's Brief at 35.

In its opinion, the trial court examined the foregoing facts considering each subsection of §5104(b). Trial Court Opinion, 8/25/22, at 10-24. In addition to its findings under subsections 5104(b)(8) and (9), discussed above, the court found that the Transfers were to an insider, under § 5104(b)(1), because the Debtors were partners of Schnader at the time. *Id.* at 10-11. Also, the Debtors knew they had been sued at the time of the Transfers (§ 5104(b)(4)), and they released the funds to Schnader shortly after a substantial verdict was entered against them (§ 5104(b)(10)).

Weighing against a finding of fraud was that the Debtors did not retain control over the funds after the Transfers (§ 5401(b)(2)), that the Debtors did not conceal the Transfers (§ 5104(b)(3)), that there was no evidence that the amount of the Transfers represented all or substantially all of the Debtors' assets (§ 5104(b)(5)), that the Debtors did not abscond (§ 5104(b)(6)), that they did not conceal any assets (§ 5104(b)(7)), and that Schnader did not subsequently transfer the money to an insider of the Debtors (§ 5104(b)(11)).

After conducting its § 5104(b) analysis, the trial court concluded that the Debtors did not act with intent to hinder, delay, or defraud Appellant, but rather to procure legal representation to appeal from the Underlying Judgment. Trial Court Opinion, 8/25/22, at 25.

The record supports the trial court's findings. There is no dispute that the Debtors retained Schnader to represent them in their appeal from the Judgment, and that Schnader did so. The Debtors' appeal resulted in a published opinion from this Court and another from the Pennsylvania Supreme Court. *TrizecHahn Gateway LLC v. Titus*, 930 A.2d 524 (Pa. Super. 2007), ***reversed in part***, 976 A.2d 474 (Pa. 2009). Given all the foregoing, we conclude the record supports the trial courts' findings as to the lack of intent to delay, hinder, or defraud Appellant. Appellant's third argument does not merit relief.

Appellant's fourth argument is that the trial court erred in failing to follow this Court's previous instructions to analyze whether the Debtors received reasonably equivalent value, from the standpoint of Appellant, in exchange for the Transfers. We have already addressed the substance of this argument above. Here we note only that the trial court's opinion contained sufficient findings of fact to facilitate appellate review of this issue. While our analysis of the meaning of utility from the creditor's point of view differs from that of the trial court, we discern no reversible error in the trial court's decision and no need for further remand. It is well established that this Court may

affirm the trial court on any valid basis. ***Dockery v. Thomas Jefferson Univ. Hosps., Inc.***, 253 A.3d 716, 721 (Pa. Super. 2021).

Appellant's fifth and final argument is that the trial court erred in failing to address its claims under §§ 5104(a)(2)(ii) and 5105. These subsections are distinct from § 5104(a)(1) in that they do not require a finding of intent to hinder, delay, or defraud a creditor as per § 5104(a)(1) and (b). Section 5104(a)(2)(ii) provides:

> **(a) General rule.--**A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> […]
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> […]
>
> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa.C.S.A. § 5104(b)(2)(ii). And § 5105, titled "Transfers fraudulent as to present creditors," provides that,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa.C.S.A. § 5105.

Each of these sections requires, as a predicate, that the debtor made a transfer without receiving reasonably equivalent value. The findings of fact in the trial court's August 25, 2022 opinion are sufficient to facilitate our review of these issues. For the reasons we have explained above, we believe that a judgment debtor's payment of a retainer fee to appellate counsel to handle an appeal from the judgment is permissible under PUFTA, and we believe the judgment creditor can be expected to understand the utility of that transaction. Because we affirm the trial court's decision that Appellant has failed to establish the lack of reasonable equivalent value, we have no basis for overturning the trial court's decision as to these subsections. Finally, because we affirm the trial court's decisions under §§ 5104 and 5105, we have no occasion to analyze a defense under § 5108.

Ultimately, we believe this matter required the finder of fact to make a judgment call between one of two scenarios. The benign scenario is that the Debtors used the Transfers to retain Schnader to represent them in an appeal from a judgment they believed was entered against them in error. Appellees posit that a ruling against them would preclude any judgment debtor from ever appealing from a judgment large enough to render the debtor insolvent. The malign scenario is that the Debtors intended to place an asset beyond Appellant's reach in anticipation of the Judgment the Debtors knew would be entered against them. In the words of Judge Friedman, who presided over the trial:

As we stated [prior to trial], the unavoidable suggestion prior to the instant trial testimony was that, at the time [of the Transfers], [the Debtors] had acted to defeat [Appellant's] right to collect the [J]udgment that would surely be entered against the former Titus & McConomy partners. This would have been in keeping with Mr. Titus's blithe handling of the winding up of that partnership's rental obligations, and it is not surprising that [Appellant] was highly skeptical of the legitimacy of the [Transfers]. The subsequent discharges in bankruptcy of [the Debtors'] substantial obligations to Schnader would only have confirmed [Appellant's] view of the [Transfers].

Trial Court Opinion, 5/24/18, at 3.

We believe the record contains some evidence to support either scenario. Our decision is guided by our limited standard of review, pursuant to which we will not reverse a trial court's decision unless it is "unsupported by the evidence or demonstrably capricious." *Farhat*, 74 A.3d at 153. The question is not whether this Court would have reached the same result, but whether the trial court's conclusion "can reasonably be drawn from the evidence." *Id.* Based on all the foregoing, we conclude the trial court's conclusion can reasonably be drawn from the evidence, and that it was not demonstrably motivated by capriciousness. Understandably, Appellant disagrees with much of the trial court's analysis and argues that it reached the wrong conclusion under the applicable law and our prior remand instructions. But our prior remands directed the trial court to engage in a more thorough analysis; they did not direct a result. Mindful of our applicable standard of review, we discern no reversible error.

Judgment affirmed.

- 21 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

FILED: <u>11/30/2023</u>